Christopher N. Weiss, WSBA No. 14286
Gloria S. Hong, WSBA No. 36723
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900

Attorneys for Defendant ConocoPhillips Company

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| NEIL HENRICKSEN, et ux., <br><br> Plaintiffs, <br><br> v. <br><br> CONOCOPHILLIPS COMPANY, <br><br> Defendant. | No. CV-07-224-JLQ <br><br> **DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFFS' EXPERT MARCO KALTOFEN** <br><br> NOTE FOR HEARING: <br> July 1, 2008 at 9:00 a.m. <br> Oral Argument Requested |

Defendant ConocoPhillips Company ("Conoco") files this Memorandum in Support of its Motion to Exclude Plaintiffs' Expert Marco Kaltofen.

### I. SUMMARY OF ARGUMENT

This is a toxic tort case. Neil Henricksen was exposed to gasoline as a tanker truck driver. He contends his exposure caused him to develop acute myelogenous leukemia ("AML"). To sustain his burden, Plaintiff must demonstrate: (1) generally, the amount of gasoline capable of, and necessary to cause AML; and (2) specifically, that Plaintiff sustained gasoline exposure sufficient to cause his AML. *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133-34 (9th Cir. 2002).

Plaintiff retained Marco Kaltofen, a civil engineer, to assist with proving

specific causation. *Exh. A, Kaltofen* at 4:23-5:6.[1] Plaintiff relies on Kaltofen to quantify the dose of *benzene* to which Henricksen was exposed.

Kaltofen's dose estimate is scientifically unreliable and therefore inadmissible and should be excluded. Kaltofen estimates a cumulative dose of benzene – 1.6625 ppm-years – that is well below a causal association with AML. *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 785 (S.D. Tex. 2000) (exposures of <u>200 ppm</u> can cause AML). Undeterred, Kaltofen simply boosts Henricksen's dose by 500%, using a "multiplier" Kaltofen invented for this case. Kaltofen's "multiplier" is not recognized in the literature or by any authoritative source.

## II.  DISCUSSION

A fundamental tenet of toxicology is that "the dose makes the poison." Reference Manual on Scientific Evidence, "Reference Guide on Toxicology" at 403; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."). Courts consistently require toxic-torts plaintiffs to quantify the plaintiff's dose as an essential element of their proof, and courts consistently exclude dose estimations that are not based upon a reliable methodology. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998); *Edwards v. Safety-*

---

[1] *Exhibits A-O* are authenticated by the Declaration of Brett Young Supporting Motion to Exclude Kaltofen (hereafter, each reference to "Exh _" refers to the exhibits attached to the Young declaration supporting this Motion).

70303148.2
Motion to Exclude Kaltofen- 2

*Kleen Corp.*, 61 F. Supp. 2d 1354, 1357-58 (S.D. Fla. 1999).

A.  **Kaltofen's Dose Assessment Relies on Unsupportable Assumptions.**

Kaltofen is Plaintiff's only disclosed expert on dose. Kaltofen's methodology is neither scientific nor reliable, because it results in extremely high rates of error and because there is no non-judicial use for his methodology. *McClain*, 401 F.3d at 1242; *Daubert II*, 43 F.3d at 1316-17; *Exh. H, Spencer.*

 1. **Kaltofen says that his dose assessment begins with Verma.**

Kaltofen does not rely on actual air monitoring for Mr. Henricksen or the Conoco terminal. Rather, Kaltofen estimates Henricksen's daily benzene exposure. Kaltofen purports to rely on the literature for his methodology. *Exh. A, Kaltofen* at 4:19-5:1; *Exh. I, Plaintiffs' Witness List.* Kaltofen selects a value of 0.38 ppm to estimate Mr. Henricksen's *unadjusted* daily benzene exposure.

According to his final report, dated January 31, 2007, Kaltofen cites Irving & Grumbles for this figure. However, by his deposition, Kaltofen tried to change his opinion and to instead rely on Verma for this figure. *Exh. A, Kaltofen* at 39:24-40:1; 41:8-12; 42:24-43:1; 51:12-18; 123:24-124:7. <u>The importance of the 0.38 ppm baseline figure cannot be overstated – it is the foundation of Kaltofen's entire methodology.</u> The reasons Kaltofen attempts to change his reliance to Verma from Irving & Grumbles reveals why Kaltofen's methodology is flawed and unreliable.

Verma reported on the benzene exposure of Canadian fuel transport drivers. *Exh. E, Verma.* Kaltofen testified that he relied on Verma for the 0.38 ppm "value" because Henricksen worked 10-12 hours days and Verma calculated the arithmetic mean for a 12 hour shift. *Exh. A, Kaltofen* at 52:1-53:5; 53:10-16.

## 2. The basic math of Kaltofen's dose estimate is simple.

From the .38 ppm baseline, Kaltofen's dose estimate is straightforward. Because Plaintiffs do not contend that Henricksen's exposure to diesel is a contributing factor, Kaltofen adjusted the 0.38 ppm figure for the fact that Henricksen loaded gasoline only 50% of the time during the pertinent period, 1976-1983. *Exh. A, Kaltofen* at 16:20-17:9. Verma's drivers loaded gasoline 80% of the time; accordingly, Kaltofen reduced Verma's 0.38 ppm daily value. *Id.*

From Verma's adjusted value, Kaltofen estimates that Henricksen's annual exposure to benzene from gasoline as **0.2375 ppm-years**. Kaltofen then completes his dose calculation by multiplying this annualized value (0.23775) by the 7 years Henricksen loaded at the Conoco terminal for employer Husky Oil (1976-1983), resulting in a cumulative dose estimate of **1.6625 ppm-years**. *Id.* at 18:16-20. According to Kaltofen, 1.6625 ppm-years takes into account Henricksen's loading, unloading, driving, paperwork, and all peak and intermittent exposures during the work day, as well as the number of loads Henricksen made each day. *Id.* at 19:6-9; 20:1-3; 21:2-22:4; 36:13-19; 36:25-37:6; 60:19-25.

## 3. Kaltofen then applies his 5-times "multiplier."

Recognizing that 1.6625 ppm-years is far too low for Plaintiffs' other experts to comment on a causal association with AML, Kaltofen boosts his estimate by 500%. Kaltofen's dose estimate rises to **8.3125 ppm-years**. *Exh. A, Kaltofen* at 129:18-20; 130:3-5. Kaltofen's names his boost the "Terminal open/closed Nordlinder multiplier." *Exh. G, Kaltofen Report* ("the multiplier").

Kaltofen's "multiplier" is based on the following: (1) a 1987 Swedish study by Nordlinder investigating benzene exposures during loading operations at two

Swedish fuel terminals; (2) Kaltofen says that one terminal was "closed" and the other was "open"; (3) Nordlinder does not explain what is meant by "open" or "closed." *Exh. A, Kaltofen* at 81:9-13; (3) only 5 samples were taken at the "closed" terminal and those 5 data points were averaged. *Id.* at 84:1-11; (4) 16 samples were taken at the "open" terminal and were averaged; (5) the mere presence of a roof over the loading equipment distinguished a "closed" from an "open" terminal; *Id.* at 90:21-91:3; (6) the difference between the average value at the "closed" versus "open" terminals in Sweden was approximately 5 times; (7) therefore, Kaltofen applies his "multiplier" to increase fivefold his dose estimate for Mr. Henricksen because the Conoco terminal had a shed for its loading rack; (8) Kaltofen increases his .38 ppm base value (after other adjustments) by 500%.

There are many problems with the Kaltofen "multiplier." Importantly, Nordlinder does not create a multiplier in his article. *See Exh. B, Nordlinder.* Nordliner does not even comment on the difference between data between the "open" terminal and "closed" terminal. *Id.* Nowhere in Nordlinder is there a discussion or conclusion purportedly demonstrating that loading fuel in a "closed" versus "open" terminal results in a 5-fold increase in benzene exposure. *Id.* Nordlinder does not offer that a multiplier can or should be derived from the data, nor does the article report that such results have been replicated elsewhere, nor does the author suggest that such results can be exported and applied to other work places. *Id.* Nordlinder simply lists data in a table collected at two terminals in Sweden. *Id.* at Table 3.

Nordlinder offers no discussion as to why the values for open vs. closed terminals might be different. *Id.* The article does not report that the study was

70303148.2
Motion to Exclude Kaltofen- 5

designed with controls that would allow for a comparison between open vs. closed terminals. *Id.* The data is underpowered for any such conclusion to be drawn. *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 880 (W.D. Tex. 1997) (study's small sample size precluded reliable expert conclusions). Further, Kaltofen cannot rule-out that other factors, besides the absence or inclusion of a roof, that may have affected the difference in the small sample of reported values. *See, e.g., Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 604 (D.N.J. 2002) (internal validity of study, including bias, chance, and confounding factors, must be evaluated before inferring a causal connection).

Mr. Kaltofen simply extrapolates from this small, obscure Swedish data set. He postulates that because Henricksen worked at a "closed" terminal in Spokane, Kaltofen can boost by 500% his estimated dose assessment of 1.6625 ppm-years to get to a level of over 8 ppm-years. *Exh. A, Kaltofen* at 67:15-17; 85:22-24. Kaltofen's only source is Nordlinder. *Id.* at 83:1-7; 83:20-25; 81:3-8; 93:3-8; 93:24-94:6; *Exh. H, Spencer*. ***Nowhere in Nordlinder do the authors sanction the application of a 500% multiplier to air monitoring data sets. And, although many studies have been published on exposures of gasoline truck drivers, nowhere in the body of literature has any study ever mentioned (much less authorized) the application of such a "multiplier."*** *Exh. B, Nordlinder*. Kaltofen stands alone with his "multiplier." It exists solely for purposes of this litigation.

When questioned about his "multiplier," Kaltofen provided little insight into his methodology. He admits that the "closed" terminal in Sweden simply meant that it had a roof. *Exh. A, Kaltofen* at 90:21-91:3. This lone criteria supposedly was confirmed by the author himself in email, and also later by Plaintiffs' other

70303148.2
Motion to Exclude Kaltofen- 6

experts who began communicating with Nordlinder after they were confused by Kaltofen's methodology. *Exh. J, Infante* at 21:6-19; 23:15-20; 23:21-25:2; 211:8-17. The Nordlinder article itself offers no guidance. Rather, Kaltofen relies on fellow expert Peter Infante for what Nordlinder meant. *Exh. A, Kaltofen* at 80:24-81:13. Yet, when Infante reviewed photos of the Swedish terminals that Nordlinder emailed, Infante could not tell the "open" and "closed" terminals apart. They both had roofs! *Exh. J, Infante* at 311:3-6; 312:16-313:5; 314:7-315:4; 316:2-12. [Dialogue with Nordlinder (including receipt of the photos) occurred after Plaintiffs served their expert reports on February 1, and therefore violated the disclosure dates in the Court's Scheduling Order.] When Kaltofen wrote his report employing his "multiplier," he had not seen pictures of the "closed" terminal from the Nordlinder study and had no information as to what a "closed" terminal in Sweden even meant. *Exh. A, Kaltofen* at 81:3-8; 83:1-7; 85:2-13; 86:2-7; 87:3-10; 87:23-88:3; 90:2-7; 93:19-23.

    **4. Kaltofen does not know if the Verma data is based on an "open" or "closed" terminal.**

  Beyond the fact that the Industrial Hygiene community does not recognize Kaltofen's "multiplier," Kaltofen lacks the requisite factual foundation to apply his "multiplier" to boost other researcher's data sets by 500% to reach his conclusion regarding "closed" terminals. In order to multiply "open" terminal data by 5, Kaltofen must first establish that the data he wants to boost actually was collected from an "open" terminal (*i.e.*, one without a roof). *Exh. A, Kaltofen* at 93:9-18. Kaltofen testified that his baseline value of 0.38 ppm was drawn from Verma, and yet Kaltofen has **no idea** how many of the terminals Verma studied were "open"

70303148.2
Motion to Exclude Kaltofen- 7

versus "closed." *Exh. A, Kaltofen* at 93:9-18. If the data collected by Verma in snowy Canada was obtained at terminals with roof protection, then applying the Kaltofen "multiplier" would lead to double-counting, skewing Kaltofen's estimates by 500%. *Exh. C, Sawyer* at 190:23-191:7; *In re TMI Litig. Cases*, 911 F. Supp. 775, 808 (W.D. Pa. 1996) (excluding opinion that resulted in high error rate).

The burden here was with Kaltofen and Plaintiffs, and that burden was not satisfied in Kaltofen's report as required under Federal Rule of Civil Procedure 26(a)(2). Kaltofen applies a "multiplier" that is not recognized in the literature. And the published literature (including Nordlinder) does not control for "open" vs. "closed" terminals in any published article's discussion or analysis of air monitoring data. There exists no permissible basis for Kaltofen to have multiplied Verma's value by 500%.

### 5. Kaltofen admits that the Nordlinder exposure data cannot apply to Henricksen.

Kaltofen's methodology is further undone because the Nordlinder data itself, according to Plaintiffs' own experts, cannot be applied to Henricksen. Nordlinder's Swedish drivers stood directly over the open tank hatch while loading gasoline containing up to 5% benzene. *Exh. A, Kaltofen* at 82:1-25. In contrast, Henricksen stood 7-12 feet from the open hatch, at the meter, while loading gasoline that contained approximately 1% benzene. *Exh. K, Rose* at 31:1-32:11; 33:19-25; *Exh. C, Sawyer* at 117:17-118:10. Exposure conditions at the two Swedish terminals were so different from Henricksen's experience that Kaltofen conceded Nordlinder's exposure data itself was of no use to estimating Henricksen's exposure. *Exh. A, Kaltofen* at 81:14-82:25. Nevertheless, while

70303148.2
Motion to Exclude Kaltofen- 8

Kaltofen disregards Nordlinder's raw data when trying to model Henricksen's exposures, he believes he can rely on the relationship between Nordlinder's "open" vs. "closed" at those two terminals in Sweden as the basis to multiply Henricksen's exposure estimate five fold.

6. **Nordlinder's five data points is not a reliable sample size.**

Kaltofen's "multiplier" is further flawed because Nordlinder's data set for "closed" terminals is statistically insufficient; it comprises only five measurements. *Exh. H, Spencer* According to the American Industrial Hygiene Association, "[F]ewer than six measurements leaves a great deal of uncertainty about the exposure profile." *Exh. L, AIHA*. Courts agree. Conclusions based on a small sample size lead to inaccurate results and unreliable opinions. *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 764-65 (9th Cir. 2007) (study on only 56 dolphins insufficient); *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 681 (4th Cir. 2003) (study statistically insignificant and inconclusive due to inadequate sample size). Nordlinder's data set of five is far too small and too weak to support Kaltofen's crafted "multiplier," particularly in light of the substantial volume of reliable data points published in the authoritative literature that were obtained from U.S. truck loading terminals. *Exh. H, Spencer*. In fact, adding just one additional data point to the Nordlinder "closed" measurements could shift the "multiplier" up to 8x or down to 3x, significantly changing the results. *Id.* Nordlinder's underpowered sample demonstrates the unreliability of Kaltofen's "multiplier."

7. **Kaltofen ignores pertinent studies because he needs his "multiplier."**

Ample monitoring data exists for truck drivers loading gasoline at terminals

70303148.2
Motion to Exclude Kaltofen- 9

with roofs in the United States. Peer-reviewed papers exist from the era of Plaintiffs' liability focus, when Henricksen loaded fuels for Husky Oil at Conoco's Spokane terminal (1976-1983). Some of the published papers are specific to the type of equipment and processes Henricksen employed (top loading without vapor recovery), while some are papers that describe work environments, equipment, procedures, geographic locations, time periods, and fuels very different from anything Henricksen experienced. *Exh. H, Spencer*; *compare Exh. D, Irving, Exh. M, Halder, Exh. N, Phillips, Exh. O, Rappaport with Exh. B, Nordlinder*. These publications eliminate the need to formulate a Kaltofen "multiplier" that has no purpose outside of this litigation. Kaltofen ignored the body of published literature because the result is an estimated dose for Mr. Henricksen that is far too low for the other experts to utilize in evaluating the epidemiological literature.

B.  **Kaltofen's Reliance on Verma is No Reliance At All, Making His Multiplier Even More Suspect.**

Kaltofen's methodology has other problems. He testified that his 0.38 ppm value came from Verma. However, Verma reports a value for bulk terminal drivers of **0.12 ppm**, not 0.38 ppm. *Exh. E, Verma*. There is no 0.38 ppm TWA value reported anywhere in Verma. *Id.* Trying to explain his obvious mistake, Kaltofen testified that he selected an exposure value of 0.38 ppm from a range of .25 to .48. But that range is not a range of exposure values at all, further derailing Kaltofen's methodology. *Id.*

   1.  **Kaltofen misunderstands and misapplies Verma**

Kaltofen admitted under cross-examination that Verma reports 0.12 ppm as the value for bulk terminal drivers, and that 0.38 ppm is not a reported value at all.

70303148.2
Motion to Exclude Kaltofen- 10

*Exh. A, Kaltofen* at 49:12-16; 52:12-22. But even this testimony is incorrect. Verma adjusted occupational exposure <u>limits</u> for longer work shifts, not <u>measurements</u> of exposures. The exposure measurement stays the same: 0.12 remains 0.12 ppm. Occupational exposure limits are not the same as actual exposure measurements. *See Exh. H, Spencer.* Kaltofen misunderstood the paragraph about regulatory limits, which led him to misrepresent in his report and under oath that the authors were describing exposure values, when they were not.

### 2. Kaltofen's "misreading" of the data makes his supposed reliance on Verma unreliable.

Kaltofen modeled a dose for Mr. Henricksen for top loading operations without vapor recovery. Mr. Henricksen was a tanker drives at bulk fuel terminals. Verma does not report on top loading at bulk terminals. *Exh. E, Verma; Exh. H, Spencer.* Rather, Verma's data for bulk terminal tanker truck drivers was collected for bottom loading operations. *Exh. E, Verma; Exh. B, Nordlinder* at Table 3.

### 3. Kaltofen relies on subterfuge to apply his "multiplier."

In his expert report, served on February 1, Kaltofen states that his 0.38 ppm value is based on "Reference 11." *Exh. G, Kaltofen Report.* Reference 11 is Irving & Grumbles, not Verma. *Id.* The day after Kaltofen signed his report, Kaltofen emailed fellow expert Infante regarding the source of his data. Kaltofen confirms that the source for his 0.38 ppm value is Irving & Grumbles. *Exh. F, Emails.* Irving & Grumbles reported a mean benzene exposure value of EXACTLY "0.38 ppm" for gasoline top loaders performing 4 loads of gasoline per day without vapor recovery, at a U.S. bulk fuel terminal. *Exh. D, Irving.*

By the time of deposition, Kaltofen realized he was trapped. Nevertheless,

he still tried to change his opinion, and said that he relied on Verma. *Exh. A, Kaltofen* at 39:24-40:1; 41:8-12; 42:24-43:1; 51:12-18; 123:24-124:7. Irving & Grumbles U. S. data likely was collected at a terminal with a roof. As such, the entire basis for Kaltofen's "multiplier" is undone as double counting. *Exh. C, Sawyer* at 190:23-191:7. Apparently, when Kaltofen realized he had cited data that he could not boost by 500%, he tried to change the reference he cited in his final report to Verma. Of course, even this non-disclosed Verma opinion fails to hold up — Kaltofen admits he does not know whether the Verma data was collected at terminals without a roof. *Exh. A, Kaltofen* at 93:9-18. The jury should not be asked, or permitted to fill in information that does not appear in a published peer-reviewed article.

### C. Unsupportable Assumptions Designed To Support Specific Causation Make Kaltofen's Dose Assessment Inadmissible.

Courts consistently exclude expert opinions that are based on a theory or conclusion not supported by the studies on which they rely. Taken as a whole, Kaltofen's exposure theory, particularly his "multiplier," creates a fictitious estimate that cannot apply to Henricksen, and is not supported by the authors of the very studies on which he stakes his claim. *McClain*, 401 F.3d at 1247 (criticizing expert who applied studies "beyond good science"); *O'Connor v. C'wealth Edison*, 13 F.3d 1090, 1107 (7th Cir. 1994) (testimony excluded where method and conclusion were not supported by authors on which expert relied).

An expert opinion must be based on accurate and reliable proof. Opinions based on speculation or inaccurate facts are inadmissible. *Castellow*, 97 F. Supp. 2d at 790-93 (excluding testimony based on false information that exaggerated

70303148.2
Motion to Exclude Kaltofen- 12

benzene exposure); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) (exclusion where opinion based on incomplete or inaccurate data).

Kaltofen's opinions consist of unsupported assumptions that skew his calculations at several levels. *McClain*, 401 F.3d at 1244-45 (any step rendering the analysis unreliable renders expert testimony inadmissible). He cannot confirm that his underlying facts are correct, and instead makes unsupported assumptions, such as guessing that Verma studied "closed" terminals as a basis for applying his multiplier. "Subjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of expert opinions." *Id.* at 1245; *Marmo v. Tyson Fresh Meats*, 457 F.3d 748, 757 (8th Cir. 2006) (speculative testimony, unsupported by sufficient facts, or contrary to facts, is inadmissible); *Smith v. Va. C'wealth Univ.*, 84 F.3d 672, 687 (4th Cir. 1996).

Even if Kaltofen's exposure estimate were based on accurate facts, it still lacks the requisite indicia of reliability. When considering opinions manufactured solely for litigation, courts closely analyze whether there exists any "other objective, verifiable evidence that the testimony is based on scientifically valid principles." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Peer review is the chief way of satisfying this requirement, though it also may be met by precisely explaining "how [the experts] went about reaching their conclusions and point[ing] to some objective source — a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like — to show that they have followed the scientific method...." *Id.* at 1318-19. Kaltofen has satisfied none of these requirements.

Kaltofen's "multiplier" has never been peer-reviewed. Kaltofen can cite no

literature, no learned treatise, and no professional association that has recognized or ever applied his "multiplier." *See Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 597 (9th Cir. 1996) (excluding expert who failed point to an objective source demonstrating that his method and premises were generally accepted). Absent general acceptance in the scientific community or other proof of reliability, Kaltofen's dose estimate and multiplier are speculation that must be excluded. *Daubert II,* 43 F.3d at 1317-19.

### III. CONCLUSION

Conoco respectfully requests that this Court grant its motion and enter an order excluding the testimony and opinions of Marco Kaltofen.

DATED this 12th day of May, 2008.

        STOEL RIVES LLP

        /s/*Christopher N. Weiss*
        Christopher N. Weiss, WSBA No. 14286
        Gloria S. Hong, WSBA No. 36723

        And

        FULBRIGHT & JAWORSKI, LLP

        Stephen C. Dillard, *pro hac vice*
        Brett J. Young, *pro hac vice*
        1301 McKinney, Suite 5100
        Houston, Texas 77010-3095

        Attorneys for Defendant ConocoPhillips Company

70303148.2
Motion to Exclude Kaltofen- 14

# CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

| | |
|---|---|
| Steven T. Johnson<br>Jackson Schmidt<br>Pepple Johnson Cantu & Schmidt, PLLC<br>1218 third Avenue, Suite 1900<br>Seattle, WA 98101<br>kafkaesque@pjcs.com<br>jacksonschmidt@pjcs.com<br><br>*Attorneys for Plaintiffs* | Glenn S. Draper<br>Bergman & Frocket<br>614 First Avenue, 4th Floor<br>Seattle, WA 98104<br>glenn@bergmanlegal.com<br><br>*Attorneys for Plaintiffs* |

I hereby further certify that I mailed by United States Postal Service the document to the following non-CM/ECF participants:

David Greenstone
Jeffrey Simon
SIMON, EDDINS & GREENSTONE, LLP
3232 McKinney Avenue, Suite 610
Dallas, Texas 75204

*Attorneys for Plaintiff (admitted Pro Hac Vice)*

DATED this 12th day of May, 2008.

/s/Christopher N. Weiss
Christopher N. Weiss, WSBA No. 14826
600 University Street, Suite 3600
Seattle, WA 98101

70303148.2
Motion to Exclude Kaltofen- 15