Christopher N. Weiss, WSBA No. 14826
Gloria S. Hong, WSBA No. 36723
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900

Attorneys for Defendant ConocoPhillips Company

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| NEIL HENRICKSEN, et ux., <br><br> Plaintiffs, <br><br> v. <br><br> CONOCOPHILLIPS COMPANY, <br><br> Defendant. | No. CV-07-224-JLQ <br><br> **DEFENDANT'S REPLY IN SUPPORT OF ITS DAUBERT MOTION TO EXCLUDE PLAINTIFFS' EXPERT MARCO KALTOFEN (Dkt. No. 87)** <br><br> NOTE FOR HEARING: <br> July 1, 2008 at 9:00 a.m. <br> Oral Argument Requested |

Plaintiffs' response to Conoco's motion to exclude Marco Kaltofen (Dkt. No. 87) misses the point. It ignores the key criticism of his methodology – his recently concocted multiplier, which he uses to boost Henricksen's dose of benzene by 500%. This methodology has never been accepted by the scientific community, a burden Plaintiffs must satisfy. Kaltofen's multiplier has never been peer-reviewed, and no scientific literature, no learned treatise, no professional association has ever recognized its existence, much less its reliability. Indeed, nowhere in the Nordlinder paper itself is the multiplication of data sets by 500%, or the use of the data in the manner Kaltofen employs even discussed, much less sanctioned.

A theory without support in the medical or scientific literature because it was invented, for the first time, solely for litigation is unreliable. *Daubert v.*

Reply to Kaltofen - 1

70327801.5

*Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (*Daubert II*). Because Kaltofen's multiplier and the incorrect assumptions upon which it is based lack reliability, his dose estimate must be excluded. FED. R. EVID. 702.

## I. DISCUSSION

### A. Kaltofen's Recently Concocted Multiplier Remains an Anomaly.

No one except Mr. Kaltofen seems to understand how his "5x multiplier" manages to be consistent with the Nordlinder study on which he claims to rely. Nordlinder does not recognize a multiplier in his article, nor does he indicate that a multiplier can or should be derived from the data he reported. *See Exh. B, Nordlinder*.[1] Further, Nordlinder does not comment on the difference between the data for "open" terminals and "closed" terminals, and he certainly does not suggest that loading fuel in a "closed" versus "open" terminal results in a 5-fold increase in benzene exposure. *Id*. Nordlinder does not report that such results have been replicated elsewhere, and he does not suggest that such results can be applied to other work places. *Id*. Nordlinder simply tabulates and reports data collected at two terminals in Sweden. *Id*. at Table 3. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005) (finding "a close analysis of the studies . . . [did] not authorize [the expert's] opinions); *O'Connor v. C'wealth Edison Co.*, 13 F.3d 1090, 1107 (7th Cir. 1994) (upholding exclusion of expert testimony where method and conclusion were not supported by the authors on which he claimed to rely).

Kaltofen, on the other hand, invents his multiplier for the purposes of this

---

[1] All exhibits in this reply refer to the Declaration of Brett Young Supporting Defendant's Motion to Exclude Plaintiffs' Expert Marco Kaltofen.

Reply to Kaltofen- 2
70327801.5

lawsuit in order to boost his dose calculation. *Daubert II*, 43 F.3d at 1317 (calling a "significant fact" whether expert developed opinions solely for litigation). By relying on a multiplier found nowhere in Nordlinder – the study on which he claims to rely – to achieve his desired dose, Kaltofen's methodology suffers a fatal flaw. *McClain*, 401 F.3d at 1247 (criticizing expert who attempted to expand application of studies "beyond good science" in forming opinions). The Ninth Circuit has made clear that opinions invented for litigation must be supported by objective verification, something which Plaintiffs simply have not and cannot provide for Kaltofen's self-proclaimed multiplier. *Daubert II*, 43 F.3d at 1317-18; *see also Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 597 (9th Cir. 1996) (excluding expert who failed to point to an objective source demonstrating that his method and premises were generally accepted). An "expert's bald assurance of validity is not enough. *Daubert II*, 43 F.3d at 1316. There must be "some objective, independent validation of the expert's methodology." *Id*.

Instead, Plaintiffs' failure to support the multiplier methodology with some objective verification only reinforces the conclusion that Kaltofen worked backwards to reach his desired result and his opinions rest on an unreliable methodology. *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 797 (S.D. Tex. 2000) ("Such result-driven procedures are anathema to both science and law and are properly excluded because they are too speculative to assist the triers of fact."). Tellingly, the multiplier employed by Kaltofen to calculate dose fails each and every *Daubert* factor:

1) <u>Whether the expert's theory has been subjected to peer review or publication</u>: Kaltofen's multiplier has **never** been subjected to peer

Reply to Kaltofen- 3
70327801.5

review or publication. Plaintiffs do not even try to support his concocted theory with any objective verification.

    2) <u>Whether the expert's underlying theory or technique has been generally accepted as valid by the relevant scientific community</u>: Kaltofen's multiplier has ***never*** been relied upon to calculate dose in any other benzene-related study and is ***not*** generally accepted.

    3) <u>The extent to which the expert's theory has or can be tested</u>: Kaltofen's multiplier ***cannot be and has not been tested***.

    4) <u>The known or potential rate of error of the expert's technique or theory and the existence and maintenance of standards controlling the technique's operation</u>: Kaltofen's multiplier is subject to ***an enormous rate of error*** – up to 500%.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993). Following the Supreme Court's lead, the Ninth Circuit has recognized additional factors that can be considered:

    5) <u>The extent to which the expert's theory or technique relies upon a subjective interpretation</u>: Kaltofen's multiplier is nothing if not a subjective hunch and mere speculation based on improper assumptions.

    6) <u>Non-judicial uses which have been made of the theory or technique</u>: Plaintiffs ***cannot point to a single non-judicial use*** for Kaltofen's multiplier theory. In fact, there is no support for this theory from anyone besides Kaltofen himself.

*Daubert II,* 43 F.3d at 1317-18. While an expert's principles and methodology shape the focus of a *Daubert* inquiry, "conclusions and methodology are not entirely distinct from one another" and may lead to a determination that "there is simply too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Reply to Kaltofen- 4
70327801.5

**B. Plaintiffs Offer No Response to Conoco's Other Objections to Kaltofen's Multiplier Methodology.**

In a last ditch effort to save Kaltofen's multiplier from exclusion, Plaintiffs mistakenly suggest that Conoco's objections are simply fodder for cross examination, hoping that this Court will abandon its gate-keeping role.

**1. Kaltofen fails to establish that Verma studied "open" terminals, or that the Norlinder's "closed" terminals are the same as the terminals Henricksen used.**

Kaltofen's "multiplier" requires a comparison of a group of five Swedish workers at "closed" terminals to a group of 16 workers at "open" terminals, with the result being a "5x" difference in benzene exposure for the "closed" terminal workers. *See Nordlinder*. Kaltofen then extrapolates from this small, obscure, Swedish data set and postulates that because Henricksen worked at a "closed" terminal, his dose assessment of 1.6625 ppm years can be multiplied by 5. **_Nowhere in the Swedish paper does it define the difference between "open" and "closed" terminals, and Kaltofen never bothered to verify what Nordlinder meant by a "open" or "closed" terminal_**. *See Nordlinder*.

Without pause, Kaltofen next allegedly turned to the Verma study and assumed its terminals were "open" – another fact he did not verify before applying his multiplier to calculate Henricksen's dose. In fact, Kaltofen openly admits that he has no idea how many of the terminals Verma studied were "open" versus "closed." *Exh. A, Kaltofen* at 93:9-18. As his fellow expert Dr. Sawyer acknowledged, if the data set used comes from a "closed" terminal, it would be impermissible "double-dipping" to apply the 5x multiplier as Kaltofen has done. *Exh. C, Sawyer* at 190:23-191:7. It is not a reliable scientific methodology to make

Reply to Kaltofen- 5

70327801.5

comparisons without knowing the facts upon which those comparisons are based. It is not science at all to use flawed comparisons for the first time in a lawsuit. *Marmo v. Tyson Fresh Meats*, 457 F.3d 748, 757 (8th Cir. 2006) (speculative testimony, unsupported by sufficient facts, or contrary to facts, is inadmissible).

### 2. Plaintiffs fail to address Kaltofen's sample size, which is too small to be reliable.

Whether the Nordlinder study employed a sufficient sample size in assessing open and closed terminals goes to the heart of Kaltofen's conclusion that "closed" terminals represent a 500% higher rate of benzene exposure. Proof of its unreliability is the fact that Kaltofen's multiplier changes drastically if even one measurement is added to or subtracted from Nordlinder's five "closed" measurements or 16 "open" measurements. Plaintiffs make no attempt to respond to the wealth of case law holding that small samples sizes lead to inaccurate results and **unreliable opinions**. *See, e.g., Earth Island Inst. v. Hogarth*, 494 F.3d 757, 764-65 (9th Cir. 2007) (study on only 56 dolphins insufficient to extrapolate to a larger population); *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 681 (4th Cir. 2003) (study statistically insignificant and inconclusive due to inadequate sample size); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 880 (W.D. Tex. 1997) (study's small sample size precluded reliable expert conclusions). The American Industrial Hygiene Association's Publication agrees, explaining in *A Strategy for Assessing and Managing Occupational Exposures*, "[F]ewer than six measurements leaves a great deal of uncertainty about the exposure profile." *See Exh. L, AIHA*.

Reply to Kaltofen- 6
70327801.5

### 3. Plaintiffs fail to address the confounding factors.

Kaltofen fails to satisfy yet another prerequisite to reliability, ruling out confounding factors. Nordlinder did not discuss why the values for open versus closed terminals might be different, nor did he indicate that his study was designed with controls that would allow open versus closed terminals to be compared. *Nordlinder*. Kaltofen proceeds nonetheless, making no attempt to rule-out that other factors, besides the absence or inclusion of a roof, affected the difference between the two sample sets reported in Nordlinder. *See, e.g., Kelley*, 957 F. Supp. at 878 (finding it unreasonable for expert to make conclusions based on study where authors themselves admitted confounding factors weakened the results). Internal validity factors such as bias, chance, and confounding factors must be evaluated before a causal connection can be inferred from a study. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 604 (D.N.J. 2002). Kaltofen ignores the need to do so, making his methodology suspect and unreliable.

### C. Kaltofen's Fundamental Misunderstanding of Industrial Hygiene Principles and Fatal Errors Doom His Exposure Estimate.

Not only is Kaltofen's recently concocted multiplier unsupportable, his baseline benzene value – the number on which he relies to begin his dose calculation – is equally unreliable. Plaintiffs' attempt to explain away Kaltofen's mistake in selecting a baseline value and his obvious misapplication of Verma is nonsensical. Verma contains two different types of benzene values, permissible exposure limits and actual exposure measurements. *See Exh. E, Verma*. Occupational exposure limits (OELs) are set by regulatory authorities as a ceiling

on the level of benzene exposure during an 8-hour work period. Exposure <u>limits</u> are how much exposure is legally allowed. Exposure <u>measurements</u> on the other hand reveal how much benzene a worker was actually exposed to. *See Exh. H, Spencer Aff*.

In estimating Henricksen's baseline benzene exposure, Mr. Kaltofen confused Verma's description of occupational exposure limits with the actual exposure measurements of workers. This is analogous to equating the posted speed limit with how fast one actually drives. <u>The *only* benzene exposure measurement for top-loaders that Verma reported is **0.12 ppm**</u>. Yet despite attempting to measure Henricksen's actual exposure to benzene, Kaltofen's dose methodology is based on a benzene <u>exposure limit</u>, which Verma adjusted to reflect a longer than 8-hour work shift. It is from this range of permissible <u>exposure limits</u> that Kaltofen claims to have selected his central value, which of course does not reflect or report actual exposure. Mr. Kaltofen's fundamental misunderstanding of industrial hygiene and of Verma's discussion of regulatory limits led him to misrepresent in his report (and under oath) that Verma was describing exposure measurements between 0.25 and 0.48 ppm, when he was not. But Kaltofen's mistakes do not end there.

If Kaltofen truly relied on Verma – as he testified under oath – the central value between Verma's range of exposure limits (.25 - .48) would be .365, making Henricksen's exposure, even applying the multiplier, less than 8 ppm-years, the magic number Plaintiffs feel they need to reach. Realizing the significance of selecting the true central value, Kaltofen instead chose .38 as his baseline value, simply because "it fell within the range." Based on this logic, .35 falls "within the

Reply to Kaltofen- 8
70327801.5

range" also – but of course Kaltofen did not use this value because it was too low to achieve his desired result. *See Castellow*, 97 F. Supp. at 797.

To justify his use of this made-up central value, Plaintiffs turn to the Irving and Grumbles study that measured benzene exposure levels at .38 ppm.[2] Looking past the numbers, Plaintiffs conveniently forget that the terminals in Irving may be "closed," precluding application of Kaltofen's multiplier. This puts Plaintiffs right back where they started. Accordingly, Kaltofen must claim he "relied" on Verma's "open" terminals to multiple Henricksen's dose by five, or his dose calculation does not reach 8 ppm-years.

Ultimately, Kaltofen is left with a baseline benzene value that necessarily suffers at least one of two fatal errors: 1) it relies on Verma and fails to reflect a true benzene exposure <u>measurement</u> because it is based on an arbitrary number within a range of exposure <u>limits</u>; or 2) it relies on Irving & Grumbles, and while reflecting a true benzene exposure measurement, it precludes application of Kaltofen's multiplier to boost Henricksen's exposure by 500%. Either way, Kaltofen's methodology is unreliable and fails to reflect Mr. Henricksen's actual exposure to benzene.

## II. CONCLUSION

Because neither Kaltofen's multiplier nor his methodology for calculating a baseline benzene value are reliable, much less supported by any objective source,

---

[2] In his report and in his pre-deposition correspondence, Kaltofen claimed to have relied upon Irving for the .38 ppm value. By the time of his deposition, he had done an about-face, claiming that the .38 ppm value came from Verma.

Reply to Kaltofen- 9
70327801.5

Kaltofen's opinions must be excluded under Rule 702. Conoco respectfully requests that this Court grant its motion to strike and enter an order excluding the testimony and opinions of Marco Kaltofen.

DATED this 25th day of June, 2008.

| STOEL RIVES LLP | FULBRIGHT & JAWORSKI, LLP |
|---|---|
| /s/*Christopher N. Weiss*<br>Christopher N. Weiss, WSBA No. 14826<br>Gloria S. Hong, WSBA No. 36723<br><br>And | Stephen C. Dillard, *pro hac vice*<br>Brett J. Young, *pro hac vice*<br>1301 McKinney, Suite 5100<br>Houston, Texas 77010-3095<br><br>Attorneys for Defendant ConocoPhillips Company |

Reply to Kaltofen- 10

70327801.5

# CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

| | |
|---|---|
| Steven T. Johnson<br>Jackson Schmidt<br>Pepple Johnson Cantu & Schmidt, PLLC<br>1501 Western Avenue, Suite 600<br>Seattle, WA 98101<br>kafkaesque@pjcs.com<br>jacksonschmidt@pjcs.com<br><br>***Attorneys for Plaintiffs*** | Glenn S. Draper<br>Bergman & Frocket<br>614 First Avenue, 4th Floor<br>Seattle, WA 98104<br>glenn@bergmanlegal.com<br><br>***Attorneys for Plaintiffs***<br><br>David Greenstone<br>Jeffrey Simon<br>SIMON, EDDINS & GREENSTONE, LLP<br>3232 McKinney Avenue, Suite 610<br>Dallas, Texas 75204<br>dgreenstone@seglaw.com<br><br>***Attorneys for Plaintiff (admitted Pro Hac Vice)*** |

DATED this 25th day of June, 2008.

/s/*Christopher N. Weiss*
Christopher N. Weiss, WSBA No. 14826
600 University Street, Suite 3600
Seattle, WA 98101

Reply to Kaltofen- 11
70327801.5